Citation Nr: 1305222 
Decision Date: 02/13/13 Archive Date: 02/21/13

DOCKET NO. 09-43 328 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Huntington, West Virginia


THE ISSUES

1. Entitlement to an increased initial evaluation for radiculopathy of the left lower extremity, currently evaluated as 10 percent disabling.

2. Entitlement to an increased initial evaluation for radiculopathy of the right lower extremity, currently evaluated as 10 percent disabling.

3. Entitlement to an increased initial evaluation for chondromalacia with tendonosis of the left knee, currently evaluated as 10 percent disabling.

4. Entitlement to an increased initial evaluation for Osgood-Schlatter's disease of the right knee, currently evaluated as 10 percent disabling.

5. Entitlement to an increased evaluation for residuals of the lumbar spine with spondylosis and levo-scoliosis and thoracic spondylosis, currently evaluated as 10 percent disabling for the period prior to June 14, 2010, and as 20 percent disabling beginning June 14, 2010. 

6. Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU).


REPRESENTATION

Appellant represented by: Jan Dils, Attorney


WITNESS AT HEARING ON APPEAL

The appellant and his spouse


ATTORNEY FOR THE BOARD

H. Seesel, Counsel


INTRODUCTION

The Veteran had active service from April 1999 to February 2002. 

This matter comes before the Board of Veterans' Appeals (BVA or Board) on appeal from February 2008, July 2009, and August 2010 rating decisions from the Department of Veterans Affairs (VA) Regional Office (RO) in Huntington, West Virginia.

The appeal initially included claims for service connection for depressive disorder and a bilateral ankle condition. During the pendency of the appeal, however, the Veteran withdrew these claims in an April 2011 statement. 38 U.S.C.A. § 7105; 38 C.F.R. § 20.202 (noting that an appeal may be withdrawn at any time before the Board promulgates a decision). The RO confirmed withdrawal of those issues in a February 2012 letter. Accordingly, those issues are not currently before the Board. 

The issues of entitlement to an increased evaluation for residuals of the lumbar spine with spondylosis and levo-scoliosis and thoracic spondylosis and entitlement to an evaluation in excess of 20 percent for radiculopathy of the left and right lower extremities are being remanded and are addressed in the REMAND portion of the decision below and are REMANDED to the Department of Veterans Affairs Regional Office.


FINDINGS OF FACT

1. The Veteran's Osgood-Schlatter's disease of the right knee was not manifested by limitation of flexion to 45 degrees. 

2. Beginning May 2011, the Veteran's Osgood-Schlatter's disease of the right knee was manifested by limitation of extension to 10 degrees.

3. The Veteran's chondromalacia with tendonosis of the left knee was not manifested by limitation of flexion to 45 degrees or limitation of extension to 10 degrees.

4. The Veteran's chondromalacia with tendonosis of the left knee is productive of slight instability.

5. The Veteran's Osgood-Schlatter's disease of the right knee is productive of slight instability.

6. The Veteran's radiculopathy of the left lower extremity is productive of moderate incomplete paralysis of the sciatic nerve. 

7. The Veteran's radiculopathy of the right lower extremity is productive of moderate incomplete paralysis of the sciatic nerve. 

8. The Veteran's Osgood-Schlatter's disease of the right knee, chondromalacia with tendonosis of the left knee and residuals of the lumbar spine with spondylosis and levo-scoliosis and thoracic spondylosis prevent him from securing or following substantially gainful employment. 


CONCLUSIONS OF LAW

1. The criteria for an initial disability rating in excess of 10 percent for chondromalacia with tendonosis of the left knee have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.40- 4.46, 4.59, 4.71a, Diagnostic Codes 5003, 5010, 5260 (2012); VAOPCGPREC 9-2004 (September 17, 2004). 

2. The criteria for an initial disability rating in excess of 10 percent for Osgood-Schlatter's disease of the right knee have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.40- 4.46, 4.59, 4.71a, Diagnostic Codes 5003, 5010, 5260 (2012); VAOPCGPREC 9-2004 (September 17, 2004); VAOPCGPREC 23-97 (July 1, 1997). 

3. The criteria for a separate 10 percent evaluation for the lateral instability of the left knee have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.40- 4.46, 4.59, 4.71a, Diagnostic Codes 5257 (2012); VAOPCGPREC 23-97 (July 1, 1997), VAOPCGPREC 9-98 (August 14, 1998).

4. The criteria for a separate 10 percent evaluation for the lateral instability of the right knee have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.40- 4.46, 4.59, 4.71a, Diagnostic Codes 5257 (2012); VAOPCGPREC 23-97 (July 1, 1997), VAOPCGPREC 9-98 (August 14, 1998).

5. The criteria for a 20 percent evaluation for radiculopathy of the left lower extremity have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.124a, Diagnostic Code 8620 (2012).

6. The criteria for a 20 percent evaluation for radiculopathy of the left lower extremity have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.1-4.14, 4.124a, Diagnostic Code 8620 (2012).

7. The criteria for entitlement to TDIU are met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159, 4.16 (2012).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

As provided for by the Veterans Claims Assistance Act of 2000 (VCAA), the United States Department of Veterans Affairs (VA) has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a).

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative, if any, of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. This notice must be provided prior to an initial unfavorable decision on a claim by the agency of original jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004). In Dingess v. Nicholson, 19 Vet. App. 473 (2006), the U.S. Court of Appeals for Veterans Claims (Court) held that notice under 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) includes notice that a disability rating and an effective date for the award of benefits will be assigned if the claim is granted. 

In this case, the VCAA duty to notify was satisfied by way of letters sent to the Veteran in November 2007, July 2009, and May 2010, which fully addressed all notice elements. The claims were readjudicated in a June 2012 supplemental statement of the case. Accordingly, the duty to notify has been met.

VA also has a duty to assist the Veteran in the development of the claim. This duty includes assisting the Veteran in the procurement of service treatment records and pertinent treatment records, and also providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. In this case, the RO obtained the Veteran's service treatment records, VA outpatient treatment records, and reports of VA examinations. The Veteran also submitted private medical records and lay statements in support of his claim, and he presented testimony at a Decision Review Officer (DRO) and Board hearing. 

Additionally, the Veteran was afforded several VA examinations in connection with his claims. The Board finds that the February 2008, February 2009, August 2009, June 2010, and May 2011 examinations are adequate because the examiners considered the Veteran's subjective history and complaints and performed a thorough physical examination providing all necessary findings to evaluate the claim. The Board notes the Veteran's representative argued the most recent VA examination was contradictory, as it noted both the presence of giving way but also noted no instability. Although the representative raised this argument as to the adequacy of the examination, the Board finds there is sufficient evidence in the claims file, including the Veteran's testimony, documenting instability to rate the claim. A remand solely to request the examiner to reconcile these findings would only result in further delay of adjudication of the claim and would not benefit the Veteran. Soyini v. Derwinski, 1 Vet. App. 540, 546 (1991) (strict adherence to requirements in the law does not dictate an unquestioning, blind adherence in the face of overwhelming evidence in support of the result in a particular case; such adherence would result in unnecessarily imposing additional burdens on VA with no benefit flowing to the claimant). 

The Veteran and his representative have not identified any other outstanding, available evidence that has yet to be obtained. Accordingly, the Board finds that all necessary development has been accomplished, and no further notice or assistance to the appellant is required to fulfill VA's duty to assist the appellant in the development of the claim. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio v. Principi, 16 Vet. App. 183 (2002).


Law and Analysis

Disability ratings are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify various disabilities and the criteria for specific ratings. 

If two disability ratings are potentially applicable, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.1. After careful consideration of the evidence, any reasonable doubt remaining will be resolved in favor of the Veteran. 38 C.F.R. § 4.3. 

While the Veteran's entire history is reviewed when assigning a disability rating, 38 C.F.R. § 4.1, where service connection has already been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. Francisco v. Brown, 7 Vet. App. 55 (1994). However, the Board notes that the Veteran is appealing the initial assignment of a disability rating assigned for the left knee and bilateral radiculopathy, and as such, the severity of the disability is to be considered during the entire period from the initial assignment of the evaluation to the present time. Fenderson v. West, 12 Vet. App. 119 (1999). Additionally, the Court has held that in determining the present level of a disability for any increased evaluation claim, the Board must consider the application of staged ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). In other words, where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibited diverse symptoms meeting the criteria for different ratings during the course of the appeal, the assignment of staged ratings would be necessary. 


Bilateral Knees

The Veteran seeks increased evaluations for his service-connected knee disabilities. By way of history, the RO granted service connection for Osgood-Schlatter's disease of the right knee in an April 2002 rating decision. At that time a noncompensable evaluation was assigned under Diagnostic Code 5299-5262, effective March 1, 2002. In September 2007, the Veteran requested an increased evaluation, and a February 2008 rating decision granted an increased 10 percent evaluation under Diagnostic Codes 5262-5003 for the Osgood-Schlatter's disease of the right knee effective September 14, 2007. A July 2009 rating decision also granted service connection for left knee chondromalacia with tendonosis. A 10 percent evaluation was assigned under Diagnostic Code 5299-5262, effective December 8, 2008. The Veteran contends that the current 10 percent rating evaluations do not accurately reflect the severity of his disabilities.

As noted above, the Veteran's knee disabilities were rated under Diagnostic Codes 5299-5262 and 5299-5003. Diagnostic Code 5299 indicates that the disability is not listed in the Schedule for Rating Disabilities and that it has been rated by analogy under a closely related disease or injury. 38 C.F.R. §§ 4.20, 4.27. In the present case, the RO rated the claims under Diagnostic Code 5262, which provides the criteria for impairment of the tibula and fibula. The RO later evaluated the right knee under Diagnostic Code 5003, which evaluates degenerative arthritis. 

The assignment of a particular diagnostic code to evaluate a disability is "completely dependent on the facts of a particular case." See Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the diagnosis and demonstrated symptomatology. In the present case, the Board finds the most appropriate diagnostic codes for both knees are Diagnostic Codes 5257 and 5003. Specifically, as will be discussed in detail below, the Veteran's symptoms involve limitation of motion, pain, and instability. Diagnostic Codes 5257 evaluates instability, and Diagnostic Code 5003 contemplates limitation of motion. The evidence does not demonstrate, nor has the Veteran complained of, impairment of the tibula or fibula, and as such, evaluation under Diagnostic Code 5262 is not appropriate. 

Diagnostic Code 5003 evaluates disabilities based on the degree of limitation of motion under the appropriate Diagnostic Codes, in this case Diagnostic Code 5260 and 5261. If the disability is noncompensable under the appropriate Diagnostic Code for the joint involved, a 10 percent rating will be for application for such major joint or group of minor joints affected by limitation of motion. Id. Limitation of motion needs to be objectively shown by findings such as swelling, muscle spasm, or painful motion. Id. In the absence of limitation of motion, a 10 percent evaluation is warranted for x-ray evidence of involvement of 2 or more major joints or 2 or more minor joint groups and a 20 percent evaluation is warranted with x- ray evidence of involvement of 2 or more major joints or 2 or more minor joints with occasional incapacitating exacerbations. Id. 

Under Diagnostic Code 5260, a noncompensable evaluation is warranted when flexion is limited to 60 degrees. A 10 percent evaluation is warranted when flexion is limited to 45 degrees. A 20 percent evaluation is warranted when flexion is limited to 30 degrees, and a 30 percent evaluation is warranted when flexion is limited to 15 degrees. 

The VA General Counsel has issued a precedential opinion holding that "separate ratings may be assigned under Diagnostic Code 5260 and Diagnostic Code 5261, where a Veteran has both a limitation of flexion and limitation of extension of the same leg; limitations must be rated separately to adequately compensate for functional loss associated with injury to the leg." See VAOPGCPREC 9-2004 (September 17, 2004). Under Diagnostic Code 5261, a noncompensable evaluation is warranted for extension limited to 5 degrees, a 10 percent evaluation is for assignment when extension is limited to 10 degrees and a 20 percent evaluation is for assignment when extension is limited to 15 degrees. A 30 percent evaluation is for assignment when extension is limited to 20 degrees and a 40 percent evaluation is warranted for extension limited to 30 degrees. 

The intent of the rating schedule is to recognize painful motion with joint or periarticular pathology as productive of disability. Thus, with or without degenerative arthritis, it is the intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59; see also, Burton v. Shinseki, 25 Vet. App. 1, 5 (2011) (holding that the provisions of 38 C.F.R. § 4.59 are not limited to disabilities involving arthritis). 

Moreover, when evaluating musculoskeletal disabilities, VA may, in addition to applying the schedular criteria, assign a higher disability rating when the evidence demonstrates functional loss due to limited or excessive movement, pain, weakness, excessive fatigability, or incoordination, to include during flare-ups and with repeated use, if those factors are not considered in the rating criteria. See 38 C.F.R. §§ 4.40, 4.45, 4.59; see also DeLuca v. Brown, 8 Vet. App. 202 (1995); Burton, 25 Vet. App. at 5.

Nonetheless, a disability rating higher than the minimum compensable rating is not assignable under any diagnostic code relating to range of motion where pain does not cause a compensable functional loss. Rather, the "pain must affect some aspect of 'the normal working movements of the body' such as 'excursion, strength, speed, coordination, and endurance,'" as defined in 38 C.F.R. § 4.40, before a higher rating may be assigned. Pain alone does not constitute a functional loss under the VA regulations that evaluate disability based upon range-of-motion loss. Mitchell v. Shinseki, 25 Vet. App. 32, 33, 43 (2011).

Under VAOPGCPREC 23-97, the Veteran may be assigned separate ratings for arthritis with limitation of motion under Diagnostic Code 5260 or 5261 and for instability under Diagnostic Code 5257. See VAOPGCPREC 23-97 (July 1, 1997). Under this Diagnostic Code, knee impairment with recurrent subluxation or lateral instability is rated 10 percent when mild, 20 percent when moderate and a maximum of 30 percent when severe. 38 C.F.R. § 4.71a, Diagnostic Code 5257. 

The evidence for consideration in this case includes VA outpatient treatment records, VA examination reports, private medical records, and lay testimony and statements. The Veteran has clearly been treated consistently for his bilateral knee disabilities. The record reflects that he was seen by physicians, orthopedists, and orthopedic surgeons and treated with pain medication, physical therapy, steroid injections, a transcutaneous electrical nerve stimulation (TENS) unit, heat, ice, and braces. Additionally, the record reflects treating physicians have discussed the possibility of future surgery.

The Veteran's claim for an increased evaluation for the right knee was dated in September 2007 and was received by the RO on September 14, 2007. Accordingly, the Board has considered findings from September 2006; however, in the present case, the first records documenting relevant findings during this period are from May 2007. 38 C.F.R. §3.400 (noting that the effective date for an increased evaluation can be as early as 1 year prior to the date of the receipt of the claim). The Board notes the claim for an increased evaluation for the left knee stems from the initial grant of service connection. The Veteran has not challenged the December 8, 2008, effective date of service connection of the left knee, and therefore, the relevant question in this matter is the state of his disability for the period beginning on December 8, 2008. See 38 C.F.R. § 3.400. 

VA outpatient treatment records dated from May 2007 to December 2007 reflect full range of motion of the extremities. The December 2007 record indicated there was motion from 0-120 degrees. Records in September and November 2007 also noted that the knees were stable without effusion. 

The Veteran was afforded a VA examination of the right knee in February 2008. The Veteran denied past surgery for the knees and indicated that he did not use assistive aids for walking. He was able to stand 15-30 minutes and walk more than 1/4 mile but less than one mile. There was giving way, instability, stiffness, and weakness of the right side, but he denied having any deformity or episodes of dislocation or subluxation. He reported locking episodes less than once a year, and there was no effusion. Flare-ups occurred weekly and were of moderate severity. 

A clinical examination revealed a normal gait, and there was no evidence of abnormal weight bearing. The Veteran had flexion of the right knee from 0 to 120 degrees, and no additional limitation of motion was noted with repetitive use. There was no evidence of inflammatory arthritis or joint ankylosis. There was a bump consistent with Osgood-Schlatter's disease, and crepitation and grinding were present. No mass, clicks, snaps, instability, or patellar or meniscus abnormality were noted. The examiner diagnosed the Veteran with chondromalacia patella and Osgood-Schlatter's disease of the right knee. In addition, the Veteran indicated that he was not employed and that he last worked a year prior to the examination. In this regard, he explained that he could not work in construction any more due to his knee and back problems. The examiner also noted the knee had mild effects on bathing, dressing, and grooming; moderate effects on chores, shopping, and recreation; and, severe effects on exercise and traveling. 

A May 2008 VA orthopedic consultation documented the Veteran's report that the use of braces made his knee pain worse. He also described past physical therapy that did not help and indicated that he had to quit working due to pain. A clinical examination noted that his range of motion was from -2 to 135 degrees. A valgus alignment to the lower extremities was also noted, but the patellar tracked normally in the patellar groove, and no patellar instability was noted. The assessment was patellofemoral chondrosis. 

The Veteran also submitted a September 2008 letter from a private physician. The physician noted that the Osgood Schlatter's disease of the right knee resulted in pain that, at times, left him unable to perform daily activities, including work. He had pain, limited range of motion, decreased stability, decreased strength, and crepitus and pain with ambulation. The physician explained that, due to overcompensation from the right knee, the Veteran was having similar pain and instability of the left knee. He reported wearing a knee brace provided by VA, but noted little to no improvement. 

The Veteran was afforded another VA examination in February 2009 to assess the severity of the knees. He indicated that steroid injections to the knee did not help and indicated he had to quit working due to the right knee. He reported giving way, instability, pain, weakness, and decreased speed of motion of both knees. He denied having any deformity, stiffness, or episodes of dislocation and subluxation. He reported having several locking episodes a year, but indicated that it was less than monthly. He also denied having effusion. There was swelling and severe flare-ups that occurred weekly. Walking, squatting, and stairs precipitated those flare-ups, and rest alleviated it. The Veteran reported being unable to stand more than a few minutes or walk more than a few yards without a significant increase in back and bilateral knee pain. He reported intermittent but frequent use of a brace. 

A clinical examination found that the Veteran's gait was normal, and there was no evidence of abnormal weight bearing. There was crepitus and guarding of the knees, but no mass, instability, patellar abnormality, meniscus abnormality, or bump consistent with Osgood Schlatter's disease was noted. Range of motion testing revealed flexion of the left knee from 0 to 120 degrees and flexion of the right knee from 0 to 110 degrees. There was objective evidence of pain with active motion, but there was no additional limitation after three repetitions. The examiner diagnosed the Veteran with bilateral chondromalacia patella with tendonisis and explained that he had decreased mobility and pain due to the knees. The Veteran reported that he quit working due to knee pain, and the examiner concluded the knees had a moderate effect on all types of daily activities. 

The Veteran was afforded another VA examination of the right knee in June 2010. At that time, the Veteran reported that the right knee had gotten worse and would give out without warning. He described pain and difficulty walking, and the summary of joint symptoms noted giving way, but no instability. There was pain, stiffness, weakness, decreased speed of joint motion, cracking, and popping. There was no deformity, incoordination, dislocation, subluxation, locking, or effusion. Flare-ups occurred weekly and were precipitated by cold air, walking, and movement, and they were alleviated by treatment and rest. The Veteran was unable to stand more than a few minutes or walk more than a few yards. He denied use of assistive devices and indicated that he had a knee brace, but noted that it made the pain worse so he did not use it. 

A clinical examination found that the Veteran had a normal gait with no evidence of abnormal weight bearing. There was crepitus and guarding of movement. The right knee had bumps consistent with Osgood Schlatter's disease. There were clicks and snaps, but there was no mass, instability, or patellar or meniscus abnormality. Range of motion testing reflected 5 to 95 degrees of flexion of the right knee. There was pain with repetitive motion, but no additional limitation was noted after 3 repetitions. There was also no joint ankylosis. The Veteran indicated that his usual occupation was a heavy equipment operator, but stated that he was not currently employed. He explained that he had not worked for three to four years. The diagnosis was right knee Osgood Schlatter's disease with chondromalacia and tendinitis. The knee resulted in decreased mobility and pain and had mild effects on dressing, and grooming; moderate effects on chores, shopping, recreation, traveling, and driving; and severe, effects on exercise. 

The Veteran was afforded another VA examination in May 2011. During this examination, he reported pain and weakness of the knees and explained that he had to lean on a buggy or use an electric cart in stores. He had giving way, pain, stiffness, weakness, and decreased speed of joint motion bilaterally, but there was no deformity, instability, incoordination, episodes of dislocation, subluxation, or locking. Weekly flare-ups were noted and described as moderate in severity. Cold weather and use precipitated flare-ups, and rest alleviated them. The Veteran indicated that he was unable to stand more than a few minutes or walk more than a few yards. He used a cane to ambulate. 

Upon examination, the Veteran's gait was normal, and there was no evidence of abnormal weight bearing. There was crepitus, tenderness, and guarding of movement, but there were no bumps consistent with Osgood Schlatter's disease, no mass, no clicks or snaps, and no grinding or instability. There was also no patellar or meniscus abnormality bilaterally. Range of motion testing revealed flexion of the left knee from 5 to 95 degrees, and flexion of the right knee was from 10 to 100 degrees. There was objective evidence of pain with motion, but no additional limitation of motion was noted following repetitive motion. The Veteran again explained that he stopped work due to his knees because they gave out on him at work and made employment unsafe. The diagnoses were right knee Osgood Schlatter's disease with chondromalacia and tendinitis and left knee condromalacia and tendonitis. The effects were decreased mobility, problems lifting and carrying, and pain. There were mild effects on bathing, dressing, and grooming; moderate effects on chores, shopping, exercise, and recreation; and, the knees prevented sports. 

The Veteran also provided testimony at DRO and Board hearings. During the February 2010 DRO hearing, the Veteran explained that he used a cane because of his back and knees and indicated that his knees give out. He also indicated that he was prescribed braces for the knees to help with instability. He related that he had trouble with flat surfaces and reported that the knee gave out daily, sometimes hourly. He described treatment with steroid injections and noted that the doctors did not want to do surgery, as they can only do it twice in a lifetime, so he was trying to delay surgery. He described his swelling and crepitus and testified that he could not stand for long periods or the knees would hurt and buckle. He explained that his knees made work difficult, as most jobs required walking. He also testified that he previously worked at a power plant, but indicated his knee gave out while using equipment and almost killed other workers, so he decided to quit. 

During the July 2012 Board hearing, the Veteran testified that he had problems with giving way of both knees all of the time. He explained that he would be walking and just wind up on the ground. He estimated that he fell about every other day and indicated that he used a cane to avoid falling. He had braces, but explained they did nothing to support the legs and noted that it hurt to wear the braces. He reiterated that he was too young for a knee replacement. The Veteran's spouse testified that she had seen her husband's knees give way and testified that it happens about two to three times per week. The Veteran reported that he holds on to a buggy or rides in an electric buggy to prevent falling in public. The Veteran explained that, when he was asked during the VA examination if the knees gave way, he meant instability. The Veteran also attested to having problems with prolonged standing and limited walking, and he indicated that pain and weakness increased with activity. The Veteran's representative argued that the examination was contradictory, as the examiner noted giving way but not instability. The representative indicated that the issue was not with the evaluation for pain or range of motion, but rather that the Veteran should also be rated for instability.


Limitation of Flexion and Extension

Examining the evidence in light of the above rating criteria illustrates that an increased evaluation based upon limitation of flexion and extension of the bilateral knees is not warranted. The present 10 percent rating for the right knee is assigned based on x-ray evidence of degeneration. See February 2008 rating decision. The present 10 percent rating for the left knee is assigned based upon painful motion. See July 2009 rating decision.

The pertinent evidence concerning the severity of the left and right knee shows that neither disability is manifested by flexion limited to 30 degrees to warrant a higher 20 percent evaluation based upon limitation of flexion. See 4.71a, DC 5260. Rather, range of motion testing showed that, at its worst, the right knee had flexion limited to 95 degrees. See June 2010 VA examination. Similarly, the left knee, at its worst, had flexion limited to 95 degrees. See May 2011 VA examination.

The Board has also considered whether a separate disability rating was warranted under Diagnostic Code 5261. See VAOPGCPREC 9-2004 (September 17, 2004). In this regard, however, the left knee was noted to have extension limited to 5 degrees on the May 2011 VA examination. Even factoring in pain, the Veteran's extension exceeds the extension limited to 10 required for a compensable evaluation. 

Concerning the right knee, the evidence demonstrated the Veteran had limitation of extension to 5 degrees as of the June 2010 VA examination and flexion limited to 10 degrees as of the May 2011 VA examination. While the record does reflect compensable limitation of extension, the 10 percent evaluation for limitation of extension would replace the 10 percent evaluation for x-ray evidence of arthritis and would not be provided in addition 38 C.F.R. § 4.71a, Diagnostic Code 5003, note 1 (explaining that the evaluations based on x-ray findings will not be combined with ratings based upon limitation of motion). 

The evidence reflects that the Veteran has complained of pain and limitation of motion associated with his bilateral knees and has described significant restriction on activities as a result of the disability. The records indicate the Veteran has been treated with a brace, heat, ice, TENS unit and over-the-counter medication. However, the VA examinations described above have considered the effects of painful motion, repetitive motion, and flare-ups. None of the examinations noted additional functional loss from repetition. Without any evidence of functional loss, an increased evaluation based solely on pain is not warranted. 38 C.F.R. §§ 4.45, 4.71a, Diagnostic Codes 5003, 5010; DeLuca v. Brown, 8 Vet. App. 202 (1995); Mitchell v. Shinseki, 25 Vet. App. 32 (2011). 


Instability

Although the Board was not able to grant an increased evaluation for limitation of motion, as noted above under VAOPGCPREC 9-98, separate evaluations may be warranted for instability or subluxation. In this regard, the Veteran has consistently complained of his knees giving way throughout the appeal period. He even described falling because of the knees giving way. The Veteran's spouse also testified as to seeing the Veteran fall because his knee gave out. The Veteran and his spouse are competent to describe such symptoms. Barr v. Nicholson, 21 Vet. App. 303, 309 (2007). The Board also finds the Veteran's testimony to be credible, as his description of symptoms has been consistent throughout the record and have been further corroborated by the sworn testimony of his spouse. See Buchanan v. Nicholson, 451 F.3d 1331, 1336-37 (Fed. Cir. 2006); Caluza v. Brown, 7 Vet. App. 498, 511 (1995) (credibility can be generally evaluated by a showing of interest, bias, or inconsistent statements, and the demeanor of the witness, facial plausibility of the testimony, and the consistency of the witness testimony). Accordingly a separate 10 percent evaluation for slight instability of each knee is warranted.

A higher 20 percent evaluation for instability of the knees is not warranted at this time, as the evidence does not demonstrate moderate instability. Although the Veteran and his spouse have testified as to frequent episodes of giving way, the record does not reflect objective evidence of instability upon examination. The Veteran's gait was always described as normal, and the record fails to reflect findings such as abnormal drawer or Lachman's tests. VA records dated in 2007 also described the knees as stable, and a May 2008 VA outpatient treatment record specifically indicated that there was no patellar instability. As such, at the present time a separate 10 percent evaluation, but no higher, for instability of each knee is granted. 

The Board also considered whether separate or increased evaluations were warranted under any other Diagnostic Codes pertaining to knee disabilities that would afford the Veteran a higher rating; however, there is no evidence of ankylosis of the knee to warrant a rating under Diagnostic Code 5256; no evidence of symptomatic removal of semilunar cartilage under Diagnostic Code 5259; no evidence of dislocated semilunar cartilage with frequent locking pain and effusion to warrant a rating under Diagnostic Code 5258; and, no evidence of malunion or nonunion of the tibia and fibula to warrant a rating under Diagnostic Code 5262 for impairment of the tibia and fibula.

Based upon the guidance of the Court in Hart v. Mansfield, 21 Vet. App. 505 (2007), the Board has also considered whether staged ratings are appropriate. In the present case, the Board finds the symptoms have been relatively constant throughout the appeal period, and as such, staged ratings are not appropriate. 


Bilateral Lumbar Radiculopathy

The Veteran also seeks increased evaluations for bilateral radiculopathy. By way of history, the RO granted service connection for radiculopathy of the bilateral lower extremities in an October 2009 rating decision. At that time, a 10 percent evaluation was assigned for each lower extremity under Diagnostic Code 8620, effective December 8, 2008. The Veteran has not challenged the December 8, 2008, effective date, and therefore, the relevant question in this matter is the state of his radiculopathy for the period beginning on December 8, 2008. See 38 C.F.R. § 3.400. 

In rating neurological symptoms, the site and character of the injury and the relative impairment in motor function, trophic changes, or sensory disturbances are to be considered. 38 C.F.R. § 4.120. Diagnostic Code 8620 provides that a 10 percent evaluation is warranted for mild incomplete paralysis of the sciatic nerve; a 20 percent evaluation requires moderate incomplete paralysis of the sciatic nerve; a 40 percent evaluation requires moderately severe incomplete paralysis; a 60 percent evaluation requires severe incomplete paralysis with marked muscular atrophy; and, an 80 percent evaluation requires complete paralysis of the sciatic nerve. When there is complete paralysis, the foot dangles and drops, no active movement of the muscles below the knee is possible, and flexion of the knee is weakened or (very rarely) lost. 38 C.F.R. § 4.124a, Diagnostic Code 8620. 

The term "incomplete paralysis," with this and other peripheral nerve injuries, indicates a degree of lost or impaired function substantially less than the type picture for complete paralysis given with each nerve, whether due to varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. 38 C.F.R. § 4.124a, Diseases of the Peripheral Nerves.

The words "moderate", "moderately severe", and "severe" are not defined in the rating schedule, and the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." See 38 C.F.R. § 4.6.

The Veteran underwent a VA examination of the spine in February 2008 at which time he denied having paresthesias and leg or foot weakness, but described the presence of occasional, sharp, radiating pain that went down the back of both legs to the knees. A motor examination was 5/5 in all areas tested reflecting active movement against full resistance. The muscle tone was normal, and there was no evidence of atrophy. His sensation was intact to light touch and position sense bilaterally. Knee jerk and ankle jerk reflexes were hypoactive. 

A September 2008 letter from a private physician noted the presence of bilateral lower extremity radiculopathy and indicated that the back and associated radiculopathy resulted in moderate to severe effects on daily functioning activities. 

During an August 2009 VA examination, the Veteran described sharp, stabbing pain from the lower back to the knees. He indicated that his legs fall asleep or go numb frequently and were restless at night. He had muscle strength of 5/5 in the bilateral lower extremities. A sensory examination was decreased to light touch at the plantar surface of the toes and was normal to pain and position sense. Reflexes were 1+ in the bilateral knees and ankles. There was no muscle atrophy and no evidence of abnormal muscle tone. The Veteran indicated that he last worked two to three years prior to the examination and explained that he stopped working because his knees gave out and it was no longer safe for him to work. The diagnosis was bilateral lower extremity radiculopathy, and it was noted to have a mild effect on shopping, recreation, traveling, bathing, dressing and grooming and a moderate effect on chores. 

The Veteran was afforded a VA examination of the spine in June 2010, which provided some findings relevant to the severity of the radiculopathy. The Veteran reported having numbness and paresthesias, as well as daily, radiating, sharp pain down both legs to the knees. He was unable to walk more than a few yards. His reflexes were hypoactive and evaluated as 1+ for knee jerk and ankle jerk bilaterally. His sensation was absent at the great toe to position sense, pain or pinprick, and light touch bilaterally. There was no dysesthesias. Motor examination was 5/5 reflecting active movement against full resistance in all tested areas. The Veteran's muscle tone was normal, and no atrophy was noted. The examiner noted that there was bilateral lower extremity radiculopathy and indicated that the Veteran had trouble lifting, dress, shopping, doing chores, and driving due to the back condition and related radiculopathy. 

The Veteran was afforded another VA examination in May 2011. He reported bee sting like pain in the posteriolateral thighs and numbness in the toes and feet bilaterally. He denied having any treatment for the condition. The Veteran indicated that the numbness and tingling in the feet made ambulation difficult. He described dysesthesias and pain of the posteriolateral thighs, as well as numbness and paresthesias described as tingling of the toes and distal feet. He explained that he could no longer drive due to the numbness. A clinical examination reflected hypoactive knee and ankle jerk reflexes evaluated as 1+ in the bilateral extremities. Sensation was absent at the great toe and medial aspect of foot for position sense, pain or pinprick, and light touch bilaterally. There was no dysesthesias. Motor examination was 5/5 in all areas tested reflecting active movement against full resistance. Muscle tone was normal, and there was no atrophy. The diagnosis was radiculopathy of the bilateral lower extremities with nerve dysfunction. There was no paralysis or neuritis, but neuralgia was present. The effect on occupation was decreased mobility and an inability to drive. 

During the July 2012 Board hearing, the Veteran reported having constant non-radiating numbness and radiating pain that he felt inside his feet, toes, and the outside of the foot. These symptoms made it hard to walk, and he no longer drove, as he could not tell how much pressure he was putting on the gas pedal. He indicated that he treated the condition with Advil. He also testified that he maintained motion, but had a loss of feeling.

Reviewing the evidence in light of the rating criteria above reflects that the bilateral lumbar radiculopathy symptomatology warrants at least an increased 20 percent evaluation for moderate incomplete paralysis of the sciatic nerve, as rated under Diagnostic Code 8620. Significantly, the objective evidence consistently demonstrates absent sensation throughout the appeal period and hypoactive knee jerk and ankle jerk reflexes. As there is objective evidence documenting radiculopathy, it is more than purely sensory, and an increased evaluation is warranted. 

However, at the present time, the Board is unable to determine whether an evaluation in excess of 20 percent is warranted. Specifically, while the record clearly shows some objective findings of radiculopathy, the Board is unsure whether that would most appropriately translate to moderate, moderately-severe or severe incomplete paralysis. The record also demonstrates there are additional records which need to be associated with the claims file. Therefore, the Board finds that a 20 percent evaluation is warranted at this juncture, but that a remand is necessary for an additional VA examination to determine whether an evaluation in excess of 20 percent is warranted.


Extraschedular Evaluation

The Board also considered whether the Veteran's bilateral knee disabilities and bilateral radiculopathy warranted referral for extra- schedular consideration. In exceptional cases where schedular disability ratings are found to be inadequate, consideration of an extra-schedular disability rating is made. 38 C.F.R. § 3.321(b)(1). There is a three-step analysis for determining whether an extra-schedular disability rating is appropriate. See Thun v. Peake, 22 Vet. App. 111 (2008). First, there must be a comparison between the level of severity and symptomatology of the Veteran's service-connected disability and the established criteria found in the rating schedule to determine whether the Veteran's disability picture is adequately contemplated by the rating schedule. Id. If not, the second step is to determine whether the claimant's exceptional disability picture exhibits other related factors identified in the regulations as "governing norms." Id.; see also 38 C.F.R. § 3.321(b)(1) (governing norms include marked interference with employment and frequent periods of hospitalization). If the factors of step two are found to exist, the third step is to refer the case to the Under Secretary for Benefits or the Director of the Compensation and Pension Service for a determination whether, to accord justice, the claimant's disability picture requires the assignment of an extra- schedular rating. Id. 

In this case, the evidence does not show that the Veteran's disabilities present an exceptional disability picture, insofar as his symptoms are expressly contemplated by the rating schedule. Concerning the bilateral knees, the Veteran has complained of pain, limitation of motion, and instability. Such symptoms are contemplated by the schedular criteria in conjunction with 38 C.F.R. § 4.40, 4.55 and 4.59. The applicable diagnostic codes expressly consider limitation of flexion and extension, subluxation, and instability. The regulations and caselaw also mandate consideration of painful motion, and the effects of repetitive motion, weakness, fatigability, swelling, and atrophy. In other words, Diagnostic Codes 5003, 5257, 5260, and 5261 adequately contemplate all of the Veteran's symptoms. Similarly, concerning bilateral radiculopathy, the Veteran's complaints of numbness, pain, and impaired sensation are all considered in the criteria for the currently assigned 20 percent rating which contemplates impaired function and sensation, including subjective and objective findings of paralysis, such as weakness, decreased active movement of the muscles, and atrophy. In other words, the Veteran has not provided evidence of any symptoms that are not expressly contemplated by the rating criteria under Diagnostic Code 8620. Additionally, the rating criteria provide for higher ratings for additional or more severe symptoms than currently shown by the evidence. 

In any event, assuming arguendo that such rating criteria were inadequate, the Board finds that the Veteran meets the criteria for TDIU as a result of his disabilities, which is the greater benefit, thereby rendering the issue of an extraschedular evaluation moot. See Kellar v. Brown, 6 Vet. App. 157, 162 (1994) (recognizing that "the effect of a service-connected disability appears to be measured differently for purposes of extraschedular consideration under 38 C.F.R. § 3.321(b)(1). . . and for purposes of a TDIU claim under 38 C.F.R. § 4.16 "); see also Thun v. Peake, 22 Vet. App. 111 (2008) ("[E]xtraschedular consideration [under § 3.321] may be warranted for disabilities that present a loss of earning capacity that is less severe than one where the Veteran is totally unemployable."). 

As the rating criteria adequately contemplate the Veteran's symptoms, the Board finds that referral to the Under Secretary for Benefits or the Director, Compensation and Pension Service, for consideration of an extraschedular evaluation for his disability under 38 C.F.R. § 3.321 is not warranted.


TDIU

In Rice v. Shinseki, 22 Vet. App. 447 (2009), the Court held that a total disability rating based upon individual unemployability (TDIU) claim is part of an increased disability rating claim when such claim is raised by the record. The Court further held that, when evidence of unemployability is submitted at the same time that the Veteran is appealing the rating assigned for a disability, the claim for TDIU will be considered part and parcel of the claim for benefits for the underlying disability. Id.

As an initial matter, the Board notes that entitlement to TDIU has not been developed or adjudicated by the AOJ. In the present case, however, because the claim for TDIU is part and parcel of the adjudication of the claims for an increased evaluations for the knees, back and radiculopathy, and considering that the Board is granting in full the benefit sought, the Board finds there is no prejudice to the Veteran by deciding the issue of TDIU in the first instance. See Bernard v. Brown, 4 Vet. App. 384 (1993).

All Veterans who are shown to be unable to secure and follow a substantially gainful occupation by reason of service- connected disability shall be rated totally disabled. Total disability will be considered to exist when there is presented any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340. 

If the schedular rating is less than total, a total disability evaluation can be based on individual unemployability if the Veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disability, provided that the Veteran has one service-connected disability rated at 60 percent or higher; or two or more service-connected disabilities, with one disability rated at 40 percent or higher and the combined rating is 70 percent or higher. 38 C.F.R. § 4.16. Nevertheless, it is the established policy of VA that all Veterans who are individually unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16(b). In other words, even where the percentage requirements are not met, entitlement to TDIU on an extraschedular basis may be granted in exceptional cases where the Veteran is unable to secure and follow a substantially gainful occupation by reason of his service-connected disabilities. 38 C.F.R. § 4.16(b). 

If the total rating is based on a disability or combination of disabilities for which the Schedule for Rating Disabilities provides an evaluation of less than 100 percent, it must be determined that the service-connected disabilities are sufficient to produce unemployability without regard to advancing age. 38 C.F.R. § 3.341. In evaluating total disability, full consideration must be given to unusual physical or mental effects in individual cases, to peculiar effects of occupational activities, to defects in physical or mental endowment preventing the usual amount of success in overcoming the handicap of disability, and to the effects of combinations of disability. 38 C.F.R. § 4.15. 

38 C.F.R. § 4.16 does not require a finding that the schedular ratings are inadequate to compensate for the average impairments in earning capacity caused by particular disabilities, but requires only a finding that the service-connected disabilities render a particular Veteran unemployable. VAOPGCPREC 6-96 (August 16, 1996); see also Kellar v. Brown, 6 Vet. App. 157, 162 (1994). The question is whether the Veteran's service-connected disorders, without regard to nonservice-connected disorders, lack of work skills or advancing age, made him incapable of performing the acts required by employment. See Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

The Veteran is in receipt of service connection for residuals of lumbar spine with spondylosis and levoscoliosis and thoracic spondylosis, currently evaluated as 20 percent disabling; Osgood-Schlatter's disease of the right knee evaluated as 10 percent disabling; left knee chondromalacia with tendonosis associated with Osgood-Schlatter's disease of the right knee, evaluated as 10 percent disabling; and, tinnitus evaluated as 10 percent disabling. As discussed in detail above, the Board has also granted a separate evaluation for instability of the left knee, evaluated as 10 percent disabling; instability of the right knee evaluated as 10 percent disabling; and, increased the evaluations of the bilateral radiculopathy so each extremity is now rated as at least 20 percent disabling. The combined evaluation, including consideration of the bilateral factor, is 70 percent. 38 C.F.R. § 4.25, 4.26. As the lumbar spine, Osgood-Schlatter's disease of the right knee, chondromalacia with tendonosis of the left knee, and instability of the bilateral knees all involve the orthopedic body system, they may be considered as one disability. 4.16(a). Thus, the combined evaluation for the orthopedic body system is 50 percent. As such, the Veteran meets the threshold minimum percentage criteria in 38 C.F.R. § 4.16(a) for consideration of TDIU. 

The remaining question before the Board, therefore, is whether the Veteran is unemployable by reason of his service-connected disabilities alone, taking into consideration his educational and occupational background. 

The Board finds that that the evidence demonstrates that the Veteran is prevented from securing or following substantially gainful employment due to his service-connected lumbar spine and bilateral knee disabilities. As noted above, during all of the Veteran's examinations for his knees, he reported that he was a heavy equipment operator and indicated that he stopped working because his knees gave out on him. He also indicated that he almost dropped equipment on people. Accordingly, he quit because he felt it was no longer safe for him to continue working. Additionally, the Veteran provided this same history during VA examinations to evaluate unrelated physical conditions. See August 2009 VA examination of the peripheral nerves, August 2009 VA mental health examination, February 2008, June 2010 and May 2011 VA examinations of the spine. There is no reason to doubt credibility of his statements, particularly given his consistency even when being examined for unrelated problems.

After carefully reviewing all the evidence on file, the Board finds no adequate basis to reject the evidence and medical opinions of record that are favorable to the Veteran, based on a lack of credibility or probative value. Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997); Evans v. West, 12 Vet. App. 22, 26 (1998). While the competent evidence does not clearly indicate whether the Veteran would have difficulty solely in one particularly field, the evidence does show that he has difficulty walking, performing physical tasks such as lifting, does not drive, and has described himself as a "34 year old hermit." Given these findings, along with the evidence clearly illustrating that he stopped working because of his knees and back, the Board finds that the evidence sufficiently demonstrates that he is unable to secure or follow a substantially gainful occupation solely as a result of his service-connected disabilities. Accordingly, the Board resolves doubt in the Veteran's favor and finds that the evidence supports assignment of TDIU. 



ORDER

An evaluation in excess of 10 percent for chondromalacia with tendonosis of the left knee is denied.

A separate 10 percent evaluation for instability of the left knee is granted.

An evaluation in excess of 10 percent for Osgood-Schlatter's disease of the right knee is denied.

A separate 10 percent evaluation for instability of the right knee is granted.

A 20 percent evaluation for radiculopathy of the left lower extremity is granted.

A 20 percent evaluation for radiculopathy of the right lower extremity is granted.

Entitlement to TDIU is granted.



REMAND

As explained above, the Board has granted separate 20 percent evaluations for the radiculopathy of each lower extremity. The criteria for an increased 40 percent evaluation require moderately-severe incomplete paralysis of the sciatic nerve. As noted above, the Veteran has more than sensory disturbances, as there is objective evidence of hypoactive reflexes and absent sensation on clinical examination. However, it is unclear whether the objective findings are tantamount to a moderately-severe or severe incomplete paralysis, as there is also evidence that the Veteran has full motor strength and there was no atrophy. It is well-settled that the Board may not rely upon its own unsubstantiated medical opinion. Colvin v. Derwinski, 1 Vet. App. 171 (1991). As such, without further clarification, the Board is without the medical expertise to determine whether an evaluation in excess of 20 percent is warranted. Accordingly, a VA examination should be performed to determine the severity of the radiculopathy. See 38 C.F.R. § 4.2 (If the findings on an examination report do not contain sufficient detail, it is incumbent upon the rating board to return the report as inadequate for evaluation purposes). 

In addition, during the July 2012 Board hearing, the Veteran alleged that the prior VA examination of the spine was not adequate. Specifically, he argued that the examiner did not take any range of motion findings and explained that, during past examinations, the examiner used a device to measure motion (goniometer) and claimed that the May 2011 examiner did not use one. The Veteran also reported that his back had continued to worsen in severity since the most recent VA examination and described increased pain, spasms, and limitation of motion. 

Although the regulations do not require the use of a goniometer, 38 C.F.R. § 4.46 explains that the use of a goniometer in measuring limitation of motion is indispensable. Furthermore, VA's General Counsel has indicated that, when a claimant asserts that the severity of a disability has increased since the most recent rating examination, an additional examination is appropriate. VAOPGCPREC 11-95 (April 7, 1995); see also Snuffer v. Gober, 10 Vet. App. 400, 403 (1997) (holding that a Veteran was entitled to a new examination after a two year period between the last VA examination and the Veteran's contention that his disability had increased in severity) and Caffrey v. Brown, 6 Vet. App. 377, 381 (1994) (an examination too remote for rating purposes cannot be considered "contemporaneous"). Accordingly, another VA examination is required to determine the current severity of the Veteran's service-connected back disability. 

Accordingly, the case is REMANDED for the following action:

1. The RO/AMC should ask the Veteran to identify all sources of treatment that he has received for his claimed disabilities and to provide any releases necessary for VA to secure records of such treatment or evaluation. The RO/AMC should obtain copies of the complete records of all such treatment and evaluation from all identified sources. Updated records from the Clarksburg VA Medical Center from May 2011 until the present should be obtained.

If any requested records are not available, that fact must clearly be documented in the claims file and proper notification under 38 C.F.R. § 3.159(e) should be provided to the Veteran. 

2. After completing the foregoing development, the Veteran should be afforded a VA examination to ascertain the current severity and manifestations of his service-connected lumbar spine disability. Any and all studies, tests, and evaluations deemed necessary by the examiner should be performed, but should include range of motion testing using a goniometer. The examiner is requested to review all pertinent records associated with the claims file, including the Veteran's service treatment records, post-service medical records, and assertions. 

The examiner should comment on the severity of the Veteran's service-connected lumbar spine disability and report all signs and symptoms necessary for rating the Veteran's disabilities under the rating criteria. In particular, the examiner should provide the range of motion of the thoracolumbar spine in degrees and state whether there is any form of ankylosis. The examiner should also state the total duration of any incapacitating episodes over the past 12 months and identify all neurological manifestations of the disabilities. The presence of objective evidence of pain, excess fatigability, incoordination, and weakness should also be noted, as should any additional disability due to these factors.

A clear rationale for all opinions would be helpful and a discussion of the facts and medical principles involved would be of considerable assistance to the Board. Because it is important "that each disability be viewed in relation to its history [,]" 38 C.F.R. § 4.1, copies of all pertinent records in the appellant's claims file, or in the alternative, the claims file, must be made available to the examiner for review. 

3. After the records noted above have been associated with the claims file, the Veteran should be afforded a VA examination to determine the current severity and manifestations of his service-connected bilateral radiculopathy of the lower extremities. Any and all studies, tests, and evaluations deemed necessary by the examiner should be performed. The examiner is requested to review all pertinent records associated with the claims file, including the Veteran's service treatment records, post-service medical records, and assertions. 

The examiner must describe the nature and extent of such radiculopathy in terms of the severity of incomplete paralysis (i.e., moderate, moderately-severe, or severe) or complete paralysis (the foot dangles and drops, no active movement of the muscles below the knee is possible, and flexion of the knee is weakened or (very rarely) lost). In addressing the relevant clinical findings, the examiner should also note the location and severity of any neurological symptoms and the nerve groups involved.

A clear rationale for all opinions would be helpful and a discussion of the facts and medical principles involved would be of considerable assistance to the Board. Because it is important "that each disability be viewed in relation to its history [,]" 38 C.F.R. § 4.1, copies of all pertinent records in the appellant's claims file, or in the alternative, the claims file, must be made available to the examiner for review. 

4. After completing these actions, the RO should conduct any other development as may be indicated by a response received as a consequence of the actions taken in the preceding paragraphs. 

5. When the development has been completed, the case should be reviewed by the RO on the basis of additional evidence. If the benefits sought are not granted, the Veteran and his representative should be furnished a Supplemental Statement of the Case and be afforded a reasonable opportunity to respond before the record is returned to the Board for further review. 


The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2012).



______________________________________________
JESSICA J. WILLS
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs